UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

IVAN MICHAEL SUPHAL,

                Petitioner,                                 MEMORANDUM
                                                           AND ORDER
                                                         08-CV-4398 (JG) (LB)

        -against-

LUIS R. MARSHALL, Superintendent,
Sing Sing Correctional Facility,

                Respondent.
------------------------------------------------------------x
A P P E A R A N C E S :

        IVAN MICHAEL SUPHAL
                01-A-4559
                Sing Sing Correctional Facility
                354 Hunter St.
                Ossining, NY 10562
                Petitioner, *Pro Se*

        CHARLES J. HYNES
                Kings County District Attorney
                120 Broadway, 22nd Floor
                New York, NY 10271
        By:     Sholom J. Twersky
                *Attorneys for Respondent*

JOHN GLEESON, United States District Judge:

        Ivan Michael Suphal, currently incarcerated in Sing Sing Correctional Facility,

petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from his

conviction in New York State Supreme Court of depraved indifference murder.  Suphal alleges

that the trial judge erred in his administration of a pre-trial suppression hearing and in denying

Suphal's motion to dismiss the depraved indifference count, that the government submitted

falsified evidence during the litigation of Suphal's motion to vacate his conviction, and that his trial counsel and appellate counsel were constitutionally ineffective for various reasons. For the reasons stated below, the petition is denied except to the extent it contends that trial and appellate counsel ineffectively addressed the use of an eavesdropping device to locate and apprehend Suphal. Thomas Nooter, Esq., is hereby appointed as counsel for Suphal to investigate that claim. A supplemental submission shall be served and filed by appointed counsel on or before May 29, 2009. Respondent shall respond to any such submission on or before June 19, 2009.

BACKGROUND

A.      *The Crimes and the Investigation*

The government's evidence at trial established that on November 15, 1999, Suphal shot and killed Jubar "Snoop" Saunders in Brooklyn, New York. After the incident, witnesses interviewed by the police said Suphal was at the scene at the time of the shooting, and the police began to search for him.

After unsuccessful attempts to locate Suphal, the police visited an apartment shared by Melody Maria Borrero, the mother of Suphal's child, and Maria de Carmen Matos, Ms. Borrero's mother. Ms. Borrero was not present when the police arrived, but they spoke to Ms. Matos. As a result of that conversation, the police department's Technical Assistance Response Unit ("TARU") installed a device on the phone in the apartment that recorded incoming calls and identified their numbers of origin ("the listening device"). Using this device, the police intercepted an incoming call from Suphal. The call originated from a pay phone near the Belmont Motel in Queens.[1]

---

[1]      A police report attached to the supplemental submission filed by respondent indicates that the call was received at 11:40 P.M. on November 17, 1999.

At approximately 2:20 A.M. on November 18, 1999, apparently as a result of the intercepted call, the police arrived at the motel.  They discovered that Suphal was registered under his own name in Room 103.  Three officers proceeded to the area outside the closed window of the room while three others approached the door.  The officers were in plain clothes and had their weapons drawn.  As the officers approached the door, Suphal opened it, saw the officers, and slammed the door shut.  He then jumped through the closed window and was restrained and handcuffed by the police.  As he was being handcuffed, Suphal stated "I didn't kill anybody.  I am no killer . . .  You might as well kill me now.  I didn't see any blood.  He had on a blue jacket.  I just kept shooting.  I didn't see any blood."  Trial Tr. 184.

At approximately 3:05 the same morning, Suphal was taken to the 60th Precinct. After Detective Robert Bush read *Miranda* warnings to him, Suphal stated that he understood his rights and signed a form to that effect.  He then indicated that he was willing to speak without an attorney, and told the police he had shot Saunders.

Suphal also made a written statement.  His statement indicated that he had driven to West 36th Street in Brooklyn to help his mother with a broken car.  When he arrived, an individual he referred to as "Nonnie" (identified at trial as Antwon Flowers) came to his car. While Suphal and Flowers sat in the car, Saunders approached the car and began speaking to Flowers.  When Suphal told Saunders that Suphal had to leave, they "got into words."  Trial Tr. 222.  Saunders said, "Shut the hell up," and stated "that he would be right back."  *Id.* at 222.  As Saunders walked away, Suphal and Flowers exited the car.  At this point, Mark "Miz" Smith came up to Suphal and asked what was wrong with Saunders and Suphal.  *Id.* Suphal continued to watch Saunders, and asked Smith whether Saunders had a gun.  According to Suphal, "[Smith]

said, no; but [Suphal] wasn't sure and neither was [Smith], the way that he answered back to [Suphal]." *Id.* When Saunders was "about five feet in front of" Suphal, Suphal stated that "[h]e starts back arguing about how [Suphal] think[s] he is a crab nigger for what happened about a month earlier." *Id.* at 223. Suphal then saw Saunders reaching for "a big, black gun," which Suphal wrested away from him and aimed "at his left shoulder and arm." *Id.* Suphal fired the gun several times, and, when he saw that Saunders had tripped, he turned and ran back to his car, dropping the gun along the way. Suphal was charged with both depraved indifference homicide and intentional homicide, as well as other crimes. At a pre-trial suppression hearing, the trial judge ruled that the statements Suphal made during and after his arrest would be admissible at trial.

B.    *Suphal's Trial*

At trial, the government submitted evidence from police investigators and the physician who performed the autopsy on Saunders. These witnesses testified that seventeen shell casings, all from the same gun, were recovered from the scene, and that Saunders had six bullet wounds. The government also called three witnesses who saw Saunders and Suphal together at or near the time of the shooting. Smith testified that he was Suphal's brother-in-law, and that the two were friends. He was also friends with Saunders, and they both sold drugs on West 36th Street. At the time of the shooting, Smith was walking up and down the block selling drugs, and he saw Suphal and Saunders arguing in the entrance of 2844 West 36th Street.[2] While Smith was in an alley off of West 36th Street making a sale, he heard shots and ran back into the street, where he saw Saunders running towards him and Suphal a few feet behind Saunders. Although

---

[2]    According to Smith, Suphal and Saunders were arguing about an incident that had occurred a month or so earlier. At that time, the pair had been sitting in Suphal's car when they were approached by police. Saunders dropped some crack in the car, and both men were arrested when the drugs were discovered. Trial Tr. 88.

he did not see a gun, he saw "something like sparks" flashing between Suphal and Saunders. Trial Tr. at 91. After the shots ceased, he returned to the entrance of 2844, where he saw Saunders on the ground coughing up blood. On cross-examination, Smith stated that he was about six feet away from the pair when he first saw them, and was "a couple of buildings" away when he heard gunshots. *Id.* at 106. He also stated that he and Saunders had once robbed Suphal. *Id.* at 114.

Patricia Duffy, who lived next door to 2844, testified that at the time of the shooting, she was taking her garbage out. She heard voices arguing. Returning to her building, she saw Suphal, Smith, and Saunders standing in the entrance of 2844 arguing about money. She also heard Suphal say something like "I should put a cap in your ass." *Id.* at 203. She stood in her doorway to eavesdrop on the conversation, and heard gunshots. She ran to her apartment, then returned to the street a "couple of minutes later" to see Saunders lying in the street. *Id.* at 207.

Mary Watkins testified that she was in her second-floor apartment in a nearby building on the evening in question. She went to the window to call down to her niece, and saw "Mike [Suphal], Miz [Smith], Snoop [Saunders], and Nonnie [Flowers]" standing in front of a nearby building. *Id.* at 240. She stated that they appeared to be in "a little slight argument." *Id.* at 241. She closed her window, and "[a] couple of seconds later," heard "10 to 15" gunshots from that direction. *Id.* at 243. Diving to the floor for cover, Watkins heard footsteps, a car door slam, and a car starting and driving away. She stated that "[i]t was the sound of [Suphal]'s car because he has a funny sound to his car." *Id.* at 244. Fearing that her niece had been shot, she

ran downstairs, where she saw Smith, Nonnie, and a body on the ground.  She also testified that she spoke to the police about the incident a half hour later.

Detective Bush testified to the circumstances surrounding Suphal's post-arrest confession and read Suphal's statement into the record.  He also stated that the police were unable to locate or interview Flowers, although he believed that Flowers was on parole and required to report to a parole officer.  *Id.* at 225.

At the close of the government's case, Suphal's attorney moved to dismiss the depraved indifference homicide count.  The judge noted that it did not appear to be a traditional depraved indifference case, and expressed concern that the government had charged depraved indifference murder only because it was uncertain it could carry its burden of proving intentional murder.  The government argued that, given Suphal's post-arrest statement, the jury could find that he "exhibited depraved indifference to human life by firing a gun 17 times at another human being, even if he did not intend to hit him."  *Id.* at 264.  The judge ultimately decided to reserve decision on the motion.

The defense case consisted of Suphal's testimony, which was largely consistent with his post-arrest statement.  Revisiting the motion to dismiss the depraved indifference count, the court denied the motion, because "based on the testimony now on the record, . . .there is sufficient basis now to charge that."  Trial Tr. 336-37.  Suphal was found guilty of depraved indifference homicide, and sentenced to seventeen and one-half years' imprisonment.

B.     *Appeal and Collateral Proceedings*

On appeal, Suphal filed a counseled brief arguing that the government failed to disprove the defense of justification beyond a reasonable doubt. He also filed a *pro se* brief arguing that the trial judge committed reversible error by reopening the pretrial hearing.

On May 3, 2004, the Appellate Division affirmed Suphal's conviction, finding that the trial court had not abused its discretion in reopening the suppression hearing, and that Suphal's justification argument was not preserved for appellate review. *People v. Suphal*, 776 N.Y.S.2d 101 (2d Dep't 2004). The Court of Appeals denied leave to appeal on August 16, 2004. *People v. Suphal*, 3 N.Y.3d 682 (2004).

On July 14, 2005, Suphal moved to vacate his conviction pursuant to N.Y. C.P.L. § 440.10. Suphal argued that his trial counsel was constitutionally ineffective, that his Sixth Amendment rights were violated by the introduction of hearsay at trial, and that the depraved indifference murder count should not have been submitted to the jury. Counsel was appointed to represent Suphal, and argued that Suphal's conviction should be vacated under *People v. Payne*, 3. N.Y.3d 266 (2004), and that appellate counsel was constitutionally ineffective for failing to argue the applicability of *Payne*.

In a December 8, 2006 Decision and Order, Justice Gustin L. Reichbach discussed at length the "sea change in the law of depraved indifference murder initiated by *People v. Payne*" and its potential effect on Suphal's conviction. Dec. 8 Order 3. He concluded that "the Court is faced with a procedural bar to considering defendant's motion regarding depraved indifference murder since the issue was not raised" on direct appeal. *Id.* at 5. He also noted that the proper vehicle for arguing Suphal's ineffective assistance of appellate counsel claim was a petition for a writ of error *coram nobis*. *Id.* Justice Reichbach then explained why,

7

"even if the Court were to reach the merits of the issue," the evidence introduced at trial supported a depraved indifference conviction, even after *Payne*. *Id.* at 5-8. He concluded that "[t]herefore, the defendant's motion is denied in its entirety." *Id*. at 8.

Suphal then filed an error *coram nobis* petition and an application for leave to appeal Justice Reichbach's order. The Appellate Division summarily denied leave to appeal on August 22, 2007, and summarily denied the *coram nobis* application on October 2, 2007. The Court of Appeals denied leave to appeal the *coram nobis* denial on December 28, 2007. Suphal initiated a second *coram nobis* proceeding, alleging ineffective assistance of appellate counsel on other grounds, on January 25, 2008. The Appellate Division denied this petition on May 27, 2008, and leave to appeal was denied on October 3, 2008. Suphal placed the instant petition for a writ of habeas corpus in the prison mail system on October 16, 2008.

DISCUSSION

A.      *Review of State Court Adjudications under AEDPA*

A federal habeas court may overturn a state court's ruling on the merits of a claim only if the state decision was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is "an unreasonable application" of clearly established federal law if a state court "identifies the

8

correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413. An unreasonable application is more incorrect than a merely erroneous one, *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (citing *Williams*, 529 U.S. at 411), but while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence," *Gilchrist*, 260 F.3d at 93 (internal quotation marks omitted).

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it explicitly refers to federal law in its decision. *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). If a state court's summary disposition of a petition does not expressly indicate that a claim was denied as procedurally barred, a federal court must presume that the state court denied that claim on the merits. *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006).

B.      *Exhaustion of State Court Remedies*

Generally, a state prisoner seeking federal habeas review must first exhaust available state court remedies. 28 U.S.C. § 2254(b)(1). This exhaustion requirement is not satisfied unless the federal claim has been "fairly presented" to the state courts. *Daye v. Att'y Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (internal citation omitted). The district court has discretion to deny a petition that contains both exhausted and unexhausted claims on the merits. 28 U.S.C. § 2254(b)(2).

C.      *The Merits of Suphal's Claims*

1.      *The Suppression Hearing*

Suphal argues that the trial judge failed to act impartially at the suppression hearing because the judge advised the prosecution as to the deficiencies in its presentation and adjourned the hearing in order to allow it to recall witnesses to address these deficiencies.

The Supreme Court has indicated that "an impartial judge is essential to due process." *Republican Party of Minn. v. White*, 536 U.S. 765, 776 (2002), and has found that a trial court violates a litigant's due process rights when it presides over litigation in which the judge has a financial interest, *Tumey v. Ohio*, 273 U.S. 510, 523, 531-34 (1927), or in which the judge had participated while working as a prosecutor, *Bracy v. Gramley*, 520 U.S. 899, 905 (1997). However, I have found no Supreme Court case addressing when and whether, in the absence of external evidence of bias (such as a financial interest in the litigation or a previous relationship with a litigant), a trial judge's apparent predisposition toward the prosecutor's position deprives a defendant of due process.[3] Accordingly, the relevant federal law appears to be the principle that due process is violated only when "the action complained of . . . violates those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Dowling v. United States*, 493 U.S. 342, 353 (1990) (internal quotation marks omitted).

I do not find the trial court's conduct of the suppression hearing indicative of impartiality. Under N.Y.C.P.L. § 710.60, a motion to suppress evidence "must state the ground or grounds of the motion and must contain *sworn allegations of fact . . . supporting such*

---

[3]    In *United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989), the Second Circuit considered and rejected a claim that "the trial judge abandoned his impartial role and acted as the government's advocate during the suppression hearing," when, "[f]aced with conflicting testimony and what he considered to be a close issue of credibility, the judge suggested that the government should call another witness." The Court noted that the Federal Rules of Evidence empower the court to call and question witnesses *sua sponte*, and held that, "[b]y seeking additional evidence to resolve a clear conflict, the court in no way displayed a predisposition towards the government's position." *Id. Campino*, of course, does not constitute "clearly established Federal law as determined by the Supreme Court," and it does not appear to base its decision on the Due Process Clause.

*grounds*." (emphasis added). With regard to the issue of probable cause, defense counsel's pre-trial omnibus motion states only that "the defendant was arrested without probable cause." Attorney Affirmation 13, *People v. Suphal*, Indictment No. 9167/99 (N.Y. Sup. Ct. Mar. 13, 2000). This allegation is insufficient under § 760.10. *People v. Mendoza*, 82 N.Y.2d 415, 427 (1993) ("An allegation that 'I did nothing giving rise to probable cause' is, without more, plainly insufficient because probable cause is a mixed legal-factual issue and the pleading lacks the factual portion of the equation."). Given this defect, the trial court had discretion to "summarily" deny suppression on this ground. N.Y. C.P.L. § 710.60(3)(b). As a result, it was not unfair to Suphal for the judge to treat the probable cause issue as "a Dunaway concern[]" that was "not based on arguments counsel has made," Hearing Tr. 72, and to allow the prosecution to elicit additional testimony to respond to the court's concerns.[4]

Suphal also argues that his claim is cognizable under Section 2254(d)(2), which permits habeas relief from state court adjudications that "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Suphal is incorrect. Section 2254(d)(2) governs review of state court adjudications based on a "factual determination" that is "objectively unreasonable in light of the evidence presented." *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). If Suphal's argument was that a finding of probable cause was unreasonable in light of the evidence actually introduced at the hearing, his claim might implicate Section 2254(d)(2). However, Suphal's argument is that, because of its bias, the trial court solicited and received evidence that would not otherwise have

---

[4]       Suphal might argue that, insofar as defense counsel failed to properly raise the issue of probable cause in his pre-trial motion, he was ineffective. I disagree, because I cannot fathom what factual allegations defense counsel could have made in the suppression motion to support a probable cause argument. The police had interviewed Duffy, Watkins, and Smith prior to their search for Suphal, and their accounts of the shooting certainly establish probable cause to arrest Suphal.

been put on the record: specifically, the testimony received when the trial judge reopened the hearing after the prosecution rested. The propriety of this procedure is a question of law cognizable only under Section 2254(d)(1). Under this provision, as discussed above, Suphal is not entitled to relief. [5]

    2.    *Ineffective Assistance of Counsel*

Suphal contends that his trial and appellate counsel were ineffective for various reasons. The Supreme Court has established the following standard for claims that defense counsel provided ineffective assistance:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Thus, Suphal must show both (1) that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Because the arguments Suphal claims his defense counsel should have raised are all, with one possible exception,

---

[5]    Suphal also argues that the trial judge's impartiality violated his equal protection rights. Although impartiality "assures equal application of the law," its absence potentially offends notions of due process, not equal protection. *See Republican Party*, 536 U.S. at 776.

meritless, he has failed to demonstrate prejudice under *Strickland*. I address these proposed arguments in turn.

a.    *The "Wiretap" Issue*[6]

The police located and arrested Suphal because the listening device they installed in the apartment of Suphal's "common-law wife" and her mother revealed that Suphal had called the apartment from a phone near the motel where he was apprehended. Suphal contends that before he made this call, Matos and Borrero had asked the government to remove the device from their phone.[7] If the government learned of Suphal's whereabouts illegally, the evidence obtained as a result of that arrest might be subject to suppression. Suphal contends that his trial counsel's failure to investigate and seek suppression on these grounds was constitutionally ineffective.

Respondent suggests that Justice Reichbach denied this argument on the merits in his December 8, 2006 order addressing Suphal's motion to vacate. *See Jimenez*, 458 F.3d at 130 (2d Cir. 2006) (any claim presented to state court and not expressly rejected on procedurally grounds deemed denied on the merits under AEDPA). He asserts, without analysis, that the denial of the motion was not contrary to or an unreasonable application of *Strickland*, and refers me to the arguments made in the People's opposition to Suphal's motion to vacate his conviction.

---

[6]      I use the term "wiretapping" with caution, as the record reflects some confusion as to the nature of the listening device. At the suppression hearing, Detective Maiorini referred to the device as "a tape recording device on the telephone with a caller I.D.," suggesting that it had both tracing and recording capabilities. Hearing Tr. 10. Accordingly, the judge's later suggestion that the device only functioned as a tracer, *see id.* at 71 ("the information obtained is merely that of a phone number"), appears to be a misapprehension.

[7]      Suphal attached to his motion to vacate affidavits, in his own name, swearing that Matos and Borrero told him that they revoked their consent prior to his call, and that his sister (Bernice K.S. Ramkushin) told him that, although she initially gave his trial counsel funds to hire a private investigator, no investigator was hired. Mot. to Vacate Ex. C, E. However, there are no affidavits from Borrero, Matos, or Ramkushin in the record.

These arguments are unpersuasive.  In opposing Suphal's motion to vacate, the prosecutor first argued that Suphal's ineffective assistance claim was barred because, although "sufficient facts appear on the record of the proceedings underlying" the conviction to enable "adequate review" of the claim on direct appeal, the claim was not raised on appeal.  N.Y.C.P.L. § 440.10(2)(c).  However, the government fails to cite any evidence in the record indicating whether (1) the police had a warrant to install the listening device, or (2) Matos or Borrero either gave or revoked their consent to place the device on their phone.  Furthermore, the applicability of this state-court procedural bar is relevant only if it was explicitly relied on in denying Suphal's claim.  But Justice Reichbach's order does not mention Suphal's arguments regarding trial counsel's ineffectiveness, much less suggest that they were procedurally barred.  The government's reference to N.Y.C.P.L. § 440.30(4)(d), another procedural bar, misses the mark for the same reason.  There is simply nothing in these arguments that suggests why the denial of this ineffective assistance claim constituted a reasonable application of *Strickland*.

The prosecutor's only real comment on the merits of this claim in the papers submitted in opposition to the § 440 motion was the contention that, "considering the hearing court's response" to defense counsel's assertion that the use of the  listening device violated *Dunaway*, "it would appear that such an innocuous device had no potential to raise any fourth amendment concerns."  Memo in Opp. to Mot. to Vacate 6.  Even if that were correct, however, the Fourth Amendment is not the only source of law that could render use of the listening device unlawful.  If the police used the device to record a call from Suphal to the apartment without consent, it would appear they engaged in "wiretapping."  *See* N.Y. Penal Law § 250.00(1).  And if they used the device to identify the source of the call, it functioned as a "trap and trace," and

the use of such devices is also controlled by state law and may constitute the crime of "eavesdropping." *See* N.Y.C.P.L. §§ 705.00 et seq. Accordingly, it seems that if this device was used without either judicial authorization or consent, the police arrested Suphal using illegally obtained information, and the fruits of that arrest may be subject to suppression on a ground not raised by trial counsel.[8] Therefore, to determine whether Suphal's conviction was obtained in violation of *Strickland*, a hearing may be warranted to clarify the circumstances surrounding counsel's apparent failure to investigate the potentially unlawful use of the listening device.[9]

      b.      *The* Payton *Issue*

Suphal also argues that his trial counsel was ineffective because he failed to properly argue that Suphal was arrested in violation of *Payton v. New York*, 445 U.S. 573 (1980). Although counsel raised the *Payton* issue at the suppression hearing, Suphal faults counsel for failing to specifically request a *Payton* hearing. This argument is unavailing because there is no evidence suggesting that Suphal was arrested in violation of *Payton*. By Suphal's own account, which was consistent with the testimony at the hearing, he opened the door of his motel room in search of refreshments, saw the plainclothes officers approaching, slammed the door shut and jumped through the closed window, whereupon he was arrested by Detective Maiorini. Pet. Mem. 9. As the trial judge pointed out at the hearing, there was no entry into Suphal's domicile, and thus no potential for a *Payton* violation.

---

[8]     Although trial counsel attempted to argue at the hearing that the use of the listening device was unlawful, the trial judge stated that "[n]o motion has been made in regards to whatever device they did place on the phone, so that is not really before the Court." Hearing Tr. 71.

[9]     Suphal also contends that trial counsel was ineffective in failing to address the government's failure to properly seal and disclose a tape recording apparently made by the listening device. This argument is unavailing because no such tape was ever introduced at trial, and therefore Suphal suffered no prejudice from this alleged violation.

Nor am I persuaded that the officers effected a "constructive entry" into the premises in violation of *Payton*. There is no evidence that the officers ordered Suphal to leave his motel room, *see United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), or commanded him to open his door. *United States v. Winsor*, 846 F.2d 1569, 1573 (9th Cir. 1988). Before they had any opportunity to address Suphal at all, he fled his domicile through the closed window. Because I cannot fathom what counsel might have done or said to convince the trial judge that Suphal was arrested in violation of *Payton*, his *Strickland* claim on this ground is without merit.

c.      *Probable Cause for Suphal's Arrest*

Suphal faults his trial counsel for failing to effectively argue that there was no probable cause for his arrest. However, the testimony at the suppression hearing amply demonstrated probable cause. Michael Smith told the police that he saw Suphal chasing the deceased and then saw and heard gunshots coming from their vicinity. Hearing Tr. 88. Mary Watkins informed them that she saw Suphal, Saunders, and Smith standing outside her window talking. A "short time later," she heard gunfire and ran downstairs, where she saw Suphal's car driving away and Saunders's body in the street. *Id.* at 87. Patricia Duffy told police that she heard Suphal arguing with Saunders and heard gunshots shortly thereafter. *Id.* at 84. Given this evidence, the police had probable cause to arrest Suphal when they arrived at the motel. It is unsurprising that defense counsel did not (apparently) seek to have evidence suppressed on this ground. Suphal also notes that the government had time to obtain a warrant for his arrest but failed to do so. But the Fourth Amendment imposes no requirement that an arrest supported by probable cause be made only pursuant to a warrant.

d.      *Suphal's Arraignment*

Suphal also argues that his trial counsel was ineffective for failing to assert that Suphal was detained for an unreasonable length of time prior to his arraignment in violation of N.Y.C.P.L. § 140.20. However, "a delay in arraignment, even if prompted by a desire for further police questioning, does not warrant suppression" of statements obtained during a suspect's confinement, except in cases of involuntariness. *People v. Ramos*, 99 N.Y.2d 27, 35 (2002). The statement Suphal made during his pre-arraignment confinement was made only a few hours after his arrest, after he had received *Miranda* warnings, and there is no other indication that any incriminating statement was made involuntarily. Accordingly, even if counsel had successfully raised the §140.20 issue, it would have had no effect on Suphal's trial. Thus he therefore cannot demonstrate prejudice under *Strickland*.

      e.     *Confrontation Clause*

During cross-examination, the prosecutor asked Suphal whether he had gotten the gun he fired at Saunders from the basement of an abandoned building. Suphal denied doing so. He then testified that he had spent time with Melody Borrero after the shooting. This exchange followed:

> Q. Do you remember telling Melody that you went to the gate downstairs in the basement of the abandoned building, that you pushed the door open, and you went in and you got a gun. Do you remember telling her that?
> A. All I told Melody is --
> Q. Just answer my question.
> A. No, I didn't tell her that. . . .
> . . .
> Q. Do you remember telling Melody that you came out, and you and Snoop just stared at each other, Snoop walked a few steps, then you went up to him and you started shooting. Do you remember telling Melody that?
> A. No.

Trial Tr. 324-25. Suphal contends that this line of questioning used "undisclosed, hearsay statements" in violation of his Sixth Amendment right to confront his accusers. Pet. Mem. 14. This is inaccurate. The statements implied in the prosecutor's questions were allegedly statements made by Suphal himself. Indeed, rather than preventing the defendant from confronting a hearsay declarant regarding these statements, the prosecution here did the "confronting" for Suphal. Furthermore, these statements were not testimonial because, assuming they were made at all, they were made to Melody outside the context of any official proceeding. *See Crawford v. Washington*, 541 U.S. 36, 51 (defining testimony as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact"). Nor were they hearsay, because the definition of hearsay excludes a party's own statements when they are offered against him. Fed. R. Evid. 801(d)(2)(A). Although the prosecutor presumably learned of these statements by interviewing Melody, she was not required to introduce them through Borrero's testimony, nor was she required to disclose them to the defense, as they were not "favorable to the accused." *Brady v.* Maryland, 373 U.S. 83, 87 (1963). Similarly, because the statements were not made "by a defendant to a public servant," the prosecutor did not have to provide notice of her intent to offer such statements under N.Y.C.P.L. § 710.30. Finally, it does not appear that this line of questioning prejudiced Suphal. As mentioned above, the prosecutor gave him the opportunity to deny making these statements, and he did so. As a result, there was no evidence that the statements were made.[10] Accordingly, trial counsel's conduct with respect to these

---

[10] The prosecutor's questions were not themselves evidence of the statements. I also note that, even if the statements were proved and credited by the jury, they suggested that Suphal acted with intent to kill, rather than with depraved indifference to human life. The jury's verdict suggests that they were not influenced by these alleged statements or the prosecutor's arguments concerning them.

statements was neither incompetent nor prejudicial, and Suphal's contention that his Sixth Amendment rights were violated at trial is without merit.

Suphal also contends that trial counsel should have requested a missing witness charge to "counter[] the confrontation violation." Pet. Mem. 13. Although this argument is not fully illuminated by the memorandum Suphal submitted with his petition, he asserted in his motion to vacate that "[a] reasonably effective counsel would have then proceeded to impeach [the statements quoted above] with argument that Missing witness (Atwon Flowers aka Nonnie), could have refuted the alleged statement given by the prosecution main witnesses in this case." Pet. Mem. in Support of Mot. to Vacate 29.

To obtain a missing witness charge in a New York court, "it must be shown that the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case; that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him, and that the witness is available to such party." *People v. Gonzalez*, 68 N.Y.2d 424, 427 (1986). In this case, however, Suphal claims that Flowers's testimony would have refuted that of the prosecution's witnesses. Accordingly, one would not "naturally expect" Flowers to provide testimony favorable to the government, and an instruction regarding the government's failure to call Flowers would not have been appropriate. It was therefore not ineffective assistance when trial counsel did not ask for one.

3.      *Prosecutorial Misconduct*

Suphal asserts that the government "submitted falsified evidence" in response to his motion to vacate his conviction. Pet. Mem. 15. The challenged evidence pertained to Suphal's claim that pre-arraignment delay entitled him to relief. With regard to that claim,

Suphal had submitted two documents. The first is a police department "DD-5" that says he "was placed under arrest" on "11-18-99 at approx. 0232hrs." Pet. Mem. Ex. B. The second is apparently an online booking sheet; in the space below "Arraignment," it lists "Date 11/20/99," and, on the next line, "Time: 00:10." *Id.* Ex. C. The government submitted a document dated Nov. 25, 2005 that looks like a Criminal Court "Appearance History." *Id.* Ex. G. It suggests that Suphal was arraigned before Judge Martin Karopkin on November 19, 1999, but does not state the time the arraignment occurred.

Although it does not appear that Suphal has exhausted this misconduct claim in state court, I deny it as meritless. *See* 28 U.S.C. § 2254(b)(2). First, assuming that Suphal's documents accurately demonstrate that he was arraigned at 12:10 A.M. on November 20, an obvious explanation for the discrepancy in the Criminal Court record would be that Suphal's arraignment was set for the night of November 19 (and thus appears on the calendar for that date) but didn't actually occur until ten minutes after midnight. In any event, I cannot fathom a reason why the government would submit falsified evidence on this point. Suphal suggests that the government did so to protect his conviction from collateral attack. But the existence of a Section 140.20 violation is irrelevant to the validity of the conviction in this case. As discussed above, there is no indication that any of the information obtained prior to Suphal's arraignment was obtained involuntarily.

  4. *The Effect of* People v. Payne

    a. *There Was Sufficient Evidence of Depraved Indifference under* Payne

Suphal argued in his motion to vacate that his conviction was unconstitutional because there was insufficient evidence to find him guilty of depraved indifference murder. In

his December 8, 2006 decision, Justice Reichbach found that this argument was procedurally barred because Suphal had failed to raise it on direct appeal. He also opined that it was meritless, because "based on the evidence presented at trial, this is the rare case where a one on one murder could be found to qualify as a depraved indifference murder." Dec. 8 Order 5. To the extent that Judge Reichbach's relied on a procedural bar and, in the alternative, found the claim meritless, it is not cognizable under 28 U.S.C. § 2254. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). However, Suphal also argues that his appellate counsel was ineffective for failing to raise this issue on direct review. Accordingly, to assess whether any alleged ineffectiveness was prejudicial, I will address the merits of Suphal's argument.

In support of Suphal's motion to vacate, pro se counsel argued that "defendant's conviction for depraved indifference murder cannot be sustained, for he shot the victim six times, and there is no evidence that other lives were put to [*sic*] risk in the course of the shooting. The evidence at trial evinces defendant's intention to kill the victim, and there is no evidence to support the crime of depraved indifference as defined in [*People v.*] *Payne* [, 3 N.Y.3d 266 (2004)]." Pet. Mem. Ex. pp at 4. To the extent the government cites to the record to demonstrate that other lives were endangered, Suphal argues that those citations "show at most that there may have been one 'innocent' individual on the block where the shooting took place, though it is not shown where she actually was in relation to the shooting and whether she was at any risk." *Id.* at 4 n.2.

It is not disputed that Suphal shot Saunders six times. However, although sustained firing is certainly probative of intent to kill, it is not necessarily dispositive of the issue before me now. In this case, Suphal's post-arrest statement and trial testimony suggest that he

did not shoot with the intent to kill Saunders. Shortly after his arrest, he stated to the police that Saunders approached him while shouting at him and apparently reaching for a weapon. Suphal then stated that, after grabbing Saunders's gun,

> I pulled the trigger after I finished turning the gun. It was aimed at his left shoulder and arm. He had a baby, sky blue jacket on. I did not see any blood.

> He was then shifting to [*sic*] right side. I was nervous because I thought he must be reaching for another gun in his jacket pocket. I fired again, but it was to make him run without shooting me anyway. He did not bleed or show any sign that he was hurt, and I thought he wasn't hurt, and all I heard was laughing. So I thought every time I fired the gun was jumping up so that all the bullets must have missed, and there was no blood ever that I thought I should have seen through or on his baby, sky blue jacket.

> I ran in the street about four and a-half feet in between my car, my mother's car, fired a few times more; then there was still no blood. As he was running, he tripped. I turned around about a foot and a-half from where I turned at. This is where I dropped the gun. I did not look back because while he was dripping [*sic*] from the curb I was already turning and leaving. I thought he got up off the floor. This is why I thought he already got up and ran, so I dropped the gun and I left, still hearing laughing. I thought everything was all right.

Trial Tr. 223-24.

Suphal's testimony at trial was mostly consistent with this statement. While he suggested that he might have seen Saunders bleeding, *id.* at 278 ("I'm thinking I was seeing a spot of orange or something."), he also stated that when he began firing, he "wasn't intending to hurt" Saunders, *id.* at 278, and that he didn't believe he had hit Saunders. "I didn't hear no screams. I didn't see if I hit him. I probably would have stopped. I would have probably helped him." *Id.* at 279. Consistent with his post-arrest statement, Suphal testified that when Saunders began moving toward cover, he "fired a few more times just to keep him away from the back of the jeep." *Id.* at 279. Suphal also stated that, as the Saunders was moving away, he didn't "believe [Suphal] hurt him," and that Suphal turned to flee "as soon as [he] saw [Saunders]

stumbling." *Id.* at 322. In sum, based on Suphal's own testimony and statement, the jury could have concluded that he did not intend to kill Saunders but showed depraved indifference to Saunders's life by shooting him for the purposes Suphal described.

Furthermore, contrary to Suphal's contention in this petition that no other lives were endangered by his shooting, the evidence at trial demonstrated that both Flowers and Smith were standing in close proximity to both Suphal and Saunders when Suphal began shooting. Suphal's post-arrest statement states that, just before Suphal grabbed Saunders's gun, Flowers was standing about "four feet" from Saunders and Smith was also standing nearby. *Id.* at 222. At trial, Suphal testified that Flowers was standing "between" Suphal and Saunders immediately before Suphal grabbed the gun, *id.* at 313, and that Smith was only five to seven feet away. *Id.* at 315.[11]

This evidence would allow a reasonable jury to find that, when he fired the fatal shots, Suphal was initially intending to injure victim's arm to prevent him from drawing another weapon, and then was intending to fire "around" victim to cause him to flee. Suphal's explicit disavowal of any intent to kill, coupled with the fact that he fired numerous shots in close proximity not only to Saunders, but also Flowers and Smith, missing Saunders far more times than he hit him, would permit a jury to find that this was a "homicide[] in which a defendant lacking the intent to kill (but oblivious to the consequences and with depraved indifference to human life) shoots into a crowd *or otherwise endangers innocent bystanders*." *People v. Payne*, 3 N.Y.3d 266, 271 (2004) (emphasis added).

---

[11]     Suphal's argument implies that Smith and Flowers were not "innocent" bystanders, i.e., that Suphal may have intended to harm them. Although there was evidence of animus between Smith and Suphal, *see* Trial Tr. at 114 (Smith and Saunders once robbed Suphal), the record does not conclusively establish that Smith knew of or was complicit in any plan by Saunders to attack Suphal on the night in question. Furthermore, Suphal testified that he and Flowers were friends at the time of the shooting. *Id.* at 309.

Of course, *Payne* suggests that "[f]iring more rounds or inflicting more wounds does not make the act more depravedly *indifferent*, but more intentional." *Id.* at 272. However, this language appears to refer to hits rather than misses. In this case, defendant fired numerous shots at close range and missed nearly twice as often as he hit. This fact is more ambiguous than *Payne* suggests. It might mean that Suphal is a terrible marksman, but it could also suggest, consistent with Suphal's testimony, that his later shots were fired toward but not at Saunders, in an attempt to scare him away. *Payne* does not hold that all point-blank shootings that result in death are, as a matter of law, intentional murder rather than depraved indifference murder; indeed, it acknowledges that a conviction for depraved indifference murder may lie where "others [are] endangered" by "a one-on-one shooting." *Id.* at 272. Accordingly, Suphal's argument that there was insufficient evidence to support his conviction for depraved indifference murder is without merit.[12]

    b.    *The Trial Court Did Not Shift the Burden of Proof to Suphal*

Suphal moved for acquittal on the depraved indifference homicide count at the close of the government's evidence. The judge reserved decision on this motion, then denied it after Suphal presented his case, relying in large part on Suphal's own testimony to determine that sufficient evidence of depraved indifference had been demonstrated. Suphal argues that these rulings improperly shifted the burden of proof to him. This argument has been squarely rejected by the New York Court of Appeals, which has long held that "a defendant who presents evidence

---

[12]    Suphal also asserts that his "testimony is consistent with pleading for the jury's mercy, yet his overall actions and defense is consistent with intentional behavior," and claims that it is "illogical" to find his testimony probative of his "mental state on the night of the incident." Pet. Mem. 23. I disagree. Saying "I'm sorry" expresses remorse. Saying "I didn't mean to hurt him" (as Suphal did in his testimony) or "I aimed at his arm" (as he did in his post-arrest statement) suggests that Suphal did not fire at Saunders with an intent to kill. Furthermore, at trial, Suphal stated that he testified "to tell what happened," Trial Tr. at 278-79, not to express remorse.

after a court has declined to grant a trial motion to dismiss made at the close of the People's case waives subsequent review of that determination." *People v. Hines*, 97 N.Y.2d 56, 61 (2001). The Second Circuit applies the same principle with regard to both reserved and denied motions, *United States v. Goldstein*, 168 F.2d 666, 669-70 (2d Cir. 1948), and the Supreme Court has endorsed this practice in dicta. *United States v. Calderon*, 348 U.S. 160, 164 n.1 (1954). Furthermore, to the extent the trial judge found Suphal's trial testimony probative on the issue of intent, that testimony was materially consistent with Suphal's post-arrest statement to the police, which was introduced in the government's case-in-chief. See Trial Tr. 220.

     5.     *Ineffective Assistance of Appellate Counsel*

     Suphal's final argument is that his appellate counsel was constitutionally ineffective for failing to raise many of the foregoing arguments on appeal. Because these arguments, with the possible exception of the "wiretapping" issue, are meritless, Suphal suffered no prejudice from counsel's failure to raise them. Accordingly, again with that possible exception, the state court's determination that Suphal received the effective assistance of appellate counsel was not an unreasonable application of federal law.

CONCLUSION

     For the reasons stated above, Suphal's petition is denied, except for his argument concerning his counsel's efforts to suppress evidence resulting from a potentially illegal wiretap, and appellate counsel's refusal to pursue that issue on appeal. Suphal's appointed counsel shall serve and file a supplemental submission on that issue on or before May 29, 2009. Respondent shall respond to any such submission on or before June 19, 2009.

So ordered.


JOHN GLEESON, U.S.D.J.

Dated: Brooklyn, New York
      April 24, 2009